[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11968

_____

ANTHONY OLIVER,

Plaintiff-Appellant,

*versus*

WARDEN, WILCOX STATE PRISON,
CAPTAIN LAWSON,
OFFICER DEESE,
OFFICER SEAN WEAVER,
OFFICER STANFIELD,
Wilcox State Prison, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:21-cv-00183-TES

_____

Before ROSENBAUM, LAGOA, and WILSON, Circuit Judges.

PER CURIAM:

Following an attack by a fellow inmate at Wilcox State Prison, Anthony Oliver filed a lawsuit under 42 U.S.C. § 1983 against certain prison guards and their supervisors alleging that they were deliberately indifferent to the substantial risk of serious harm Oliver faced from his assailant.  After discovery, the defendants moved for summary judgment, arguing that they were entitled to qualified immunity.  The district court granted summary judgment in favor of the defendants, finding they were entitled to qualified immunity because they were not deliberately indifferent to the substantial risk of serious harm Oliver faced.

Oliver now appeals that order as it relates to three defendants, Officers Stanfield, Deese, and Weaver.  After carefully considering the record and with the benefit of oral argument, we affirm the district court's ruling.

I.    FACTUAL AND PROCEDURAL BACKGROUND

Anthony Oliver is an inmate at Wilcox State Prison.  When he arrived at Wilcox State Prison in the late summer of 2020, he

told prison staff that he identified as a woman.[1]  Oliver, however, "is not on hormone therapy, has not started hormone therapy, and has not otherwise begun the process of making a transition from male to female."  Oliver's transgender identity thus was not evident from his appearance.

On October 28, 2020, Oliver was moved into an administrative segregation dormitory after the Wilcox State Prison warden learned that Oliver had sent threatening messages to the Clerk of Chatham County.  In segregation, Oliver was placed in a single cell across from another inmate, Anquavious Morgan ("Morgan").  Because there was "nothing to do in segregation except talk through the door," Oliver and Morgan started "talking back and forth" to one another.  According to Oliver, over the next few weeks, Morgan made sexual comments and was "trash-talking" Oliver.  Specifically, Morgan tried "to entice [Oliver] . . . to move into the cell with him," asked him "[i]f [he] was homosexual," and said "[e]xplicit sexual things" like "I'm going to get you in a cell" and "fuck your tight, pink ass."  Oliver recounted that "[t]here was a lot of [Morgan] arguing through the door, going back and forth, and a lot of what you would call trash-talking . . . [saying] [a] bunch of filthy things about ejaculating all over my face, and how he wants to do this and that."

Oliver never informed correctional officers that Morgan threatened to sexually assault him.  Instead, Oliver generally

---

[1] The record does not contain any evidence that Oliver conveyed this information to Officers Stanfield, Deese, or Weaver.

informed Officer Stanfield that Morgan had made "a lot of sexual comments and statements about doing stuff." And he generally informed Officers Deese and Weaver that he wanted to "go [] to another cell."

On November 25, 2020—several weeks after Oliver's transfer to segregation—Officer Stanfield and another prison guard told Oliver that he had to move into Morgan's cell. Oliver told the officers that he did not "want to go in there" and that Morgan's nickname was "the booty bandit."[2] They moved him into Morgan's cell anyway.

Shortly after Oliver moved in, "Morgan took off all his clothes down to his underwear." According to Oliver, Morgan "kept pulling out his penis and playing with it, and he kept asking sexual questions." Morgan asked Oliver if he wanted "to give him oral sex and [Oliver] told him, no." Rebuffed by Oliver, Morgan then "talked about other stuff, him getting out of prison, prison-talk . . . to bypass the time[.]" After about "four hours," Oliver "got pulled out for a medical follow-up . . . to be checked for COVID."

During his check-up, Oliver told Officer Stanfield, another officer, and a nurse: "I don't feel comfortable with this guy in there. He's going [to] do something. He's already got his penis hanging

---

[2] According to Oliver, that nickname was given to Morgan by one of the female officers and "all" of the officers used it. Oliver also testified that he "heard inmates calling [Morgan] that" and that the other inmates "would yell it out at night." But there is no record evidence showing that Morgan ever sexually assaulted another inmate.

out and making . . . a lot of sexual comments and statements about doing stuff." Oliver also told them that Morgan has been "asking [sexual] questions, and [] was playing with himself in the cell." Oliver "protested" going back into the cell, but Officer Stanfield made him.

When Oliver got back to the cell, he saw Morgan in bed "doing a masturbation simulation with his penis out." Morgan asked Oliver if he "wanted to help him out," but Oliver said no. Morgan and Oliver then ate lunch and Morgan got "extremely high" off marijuana. Morgan kept talking to Oliver—going "on and on" "about some bizarre things, mostly sexual."

Around 6:00 p.m.,[3] Officers Deese and Weaver arrived for their evening shift. Oliver told Officer Deese: "I need to leave this room . . . I don't feel safe in here." Officer Deese told Oliver to "take [it] up with the captain tomorrow."

About two hours later, Oliver told Officer Weaver: "[S]ir, I don't feel safe in here. I'd like to go back to another cell. There's plenty of open cells." But Weaver did not move Oliver. Oliver also told Officer Deese: "[T]here's something not right about this guy. He's on . . . narcotics, drugs and I need to be moved out."

---

[3] As the district court noted, the record does not lay out a clear timeline of the events of the assault. For example, Oliver testified that "it was probably 8:30, 9:00, maybe eight o'clock" when Morgan assaulted him. The above account presents our best understanding of how the evening's events unfolded.

Sometime between 8:00 p.m. and 9:00 p.m., Morgan started smoking "paper . . . dipped into animal tranquilizer." Morgan then "pulled [Oliver] from the top bunk and began punching [him]." Oliver "felt an instant pop" in his back when he hit the ground. Morgan then grabbed a "knife from underneath his mattress," and when Oliver tried to get up, Morgan hit him with "a plastic dinner tray that he had inside the cell." Morgan continued to beat up Oliver and then raped him anally. He then ordered Oliver to perform oral sex on him at knifepoint. Oliver yelled for help during the assault, but no one came.

Despite Oliver communicating to Officers Deese and Weaver that he did not "feel safe in [his cell]," neither Officer was in the building during the assault. When Officer Deese eventually returned, Oliver discretely informed him about the attack. Six or seven officers then came to separate Oliver from Morgan.

On June 1, 2021, Oliver filed a complaint in the United States District Court for the Middle District of Georgia alleging, pursuant to 42 U.S.C. § 1983, that a handful of Wilcox State Prison officials—including Officers Stanfield, Deese, and Weaver—acted with deliberate indifference to his safety by failing to protect him from Morgan in violation of the Eighth Amendment.[4] After discovery, the defendants moved for summary judgment arguing that they were

---

[4] Oliver originally made a claim under the Georgia Constitution. The district court found that this claim was abandoned. Oliver does not appeal that ruling here and therefore has abandoned the issue on appeal as well. *See United States v. Willis*, 649 F.3d 1248, 1254 (11th Cir.2011).

entitled to qualified immunity because their conduct was not unconstitutional, let alone clearly established as unconstitutional.

The district court granted Defendants' motion, holding that no reasonable jury could find that Oliver faced a substantial risk of serious harm, or that any Defendants actually knew that Oliver faced a substantial risk of serious harm. Accordingly, the court concluded that the Defendant-Officers were entitled to qualified-immunity.

Oliver timely appealed, challenging the district court's decision on his deliberate-indifference claim only as to Officers Stanfield, Deese, and Weaver.

## II.     STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020). In doing so, "we view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 616 (11th Cir. 2007)). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party 'presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party.'" *Id.* (quoting *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1307 (11th Cir.), *cert. denied*, 571 U.S. 1045 (2013)). But if, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party," there is a genuine factual dispute and summary judgment

should not be granted. *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (internal quotations omitted).

## III.    ANALYSIS

On appeal, Oliver contends that, based on the record evidence, a reasonable jury could find that (1) Oliver faced a substantial risk of being seriously harmed by Morgan; (2) Officers Stanfield, Deese, and Weaver were "deliberately indifferent" to that risk because they put Oliver in a cell with Morgan and failed to appropriately supervise them; and (3) the Officers' deliberate indifference caused Oliver's injuries. The Defendants respond that they cannot be found liable because they are entitled to qualified immunity. After consideration of the relevant case law and the record, we hold that the Defendants were not deliberately indifferent to the substantial risk of serious harm Oliver faced. Since Oliver has not met his burden to show an Eighth Amendment violation, his claim fails.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (per curiam) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (internal quotations omitted)). A government official must prove that he was acting within his discretionary authority before being granted qualified immunity. *Caldwell*, 748 F.3d at 1098. Because Oliver concedes that the officers here were acting "within the scope of their discretionary

authority," he "bears the burden to show that the defendants are not entitled to qualified immunity." *Id.* (cleaned up); *see Marbury*, 936 F.3d at 1232 (explaining that "the burden shifts to the plaintiff" to defeat qualified immunity after it has been established that an official was acting within his discretionary duties).

To meet this burden, Oliver must "show (1) that the official[s] violated a constitutional right *and* (2) that the right was clearly established at the time of the alleged violation." *Marbury*, 936 F.3d at 1232 (emphasis added) (citing *Caldwell*, 748 F.3d at 1099). The district court determined that because Oliver could not show that Defendants violated a constitutional right, Defendants were entitled to summary judgment.[5] We agree.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). Because prisoners have shown "proclivities for antisocial criminal, and often violent, conduct," are stripped of almost all means of self-protection, and cannot receive help from the outside world, *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)) (internal quotations omitted), the Eighth Amendment requires

---

[5] The district court did not consider the "clearly-established" prong of the qualified-immunity analysis—it found that the Defendants were entitled to qualified immunity after determining there was no constitutional violation.

"prison officials to take reasonable measures to guarantee" inmates' safety. *Brooks*, 800 F.3d at 1300 (quoting *Caldwell*, 748 F.3d at 1099). In practice, this means that prison officials must protect prisoners from "violence at the hands of other prisoners." *Id.* (quoting *Farmer*, 511 U.S. at 833).

But not every injury sustained "by one inmate at the hands of another" "translates into a constitutional liability for prison officials responsible for the victim's safety." *Caldwell*, 748 F.3d at 1099 (quoting *Farmer*, 511 U.S. at 834). A "prison official [only] violates the Eighth Amendment's prohibition against cruel and unusual punishment if he is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016). To establish a deliberate-indifference claim, "a plaintiff must show (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) causation.'" *Marbury*, 936 F.3d at 1233 (quoting *Lane*, 835 F.3d at 1307).

"The first element of deliberate indifference—whether there was a substantial risk of serious harm—is assessed objectively and requires the plaintiff to show 'conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety.'" *Id.* (quoting *Lane*, 835 F.3d at 1307).[6]

---

[6] The district court determined that Oliver failed "to show an objectively substantial risk personal to him." Drawing all factual inferences in Oliver's favor, we would not necessarily reach the same conclusion. Oliver provided evidence that Morgan told him that he was "going to make arrangements" to

The second element—whether officials were deliberately indifferent to that risk—requires a plaintiff to prove both an objective and subjective component. *Id.* "The subjective component requires" the plaintiff to provide "evidence that the defendant officer actually (subjectively) knew of the risk to the plaintiff inmate." *Nelson v. Tompkins*, 89 F.4th 1289, 1297 (11th Cir. 2024), *cert. denied sub nom. Sellers v. Nelson*, 145 S. Ct. 178 (2024) (citing *Mosley*, 966 F.3d at 1270–71) (internal quotations omitted). "'This standard is one of subjective recklessness as used in the criminal law' and it is 'a difficult burden for a plaintiff to meet[.]'" *Id.* (quoting *Farmer*, 511 U.S. 825, 839–40; then quoting *West v. Tillman*, 496 F.3d 1321, 1327 (11th

---

"get [him] in a cell, and . . . fuck [his] tight, pink ass." That is not evidence of Morgan's "propensity to misbehave," but instead evidence of a specific and particularized threat made to Oliver by Morgan. *Nelson*, 89 F.4th at 1296–97; *see also Carter v. Galloway*, 352 F.3d 1346 at 1349–50 (11th Cir. 2003) (per curiam) (explaining that evidence of an attacker's "generally problematic nature" will not alone suffice to prove that he posed a substantial risk of serious harm; however, showing "a particularized threat or fear" can); and *compare Rodriguez*, 508 F.3d at 617 n.12 (11th Cir. 2007) (finding summary judgment in favor of prison officials inappropriate where plaintiff-inmate had provided evidence that his life was threatened by members of his former gang who were inmates in the same prison) and *Nelson*, 89 F.4th at 1297 (finding that a white inmate faced a substantial risk of serious harm when he had to share a cell with an inmate whose underlying offense was stabbing a white man only because he was white) *with Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (finding that summary judgment in favor of prison officials was appropriate when an inmate-plaintiff reported an unspecified "racial problem" in his shared cell). But even if we disagreed with the district court's holding on the first element, it would not change the outcome of this case because we conclude that Oliver has not shown that the defendants were subjectively aware of that objectively substantial risk.

Cir. 2007)).  The objective component requires the plaintiff show that the official "responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." *Marbury*, 936 F.3d at 1233 (quoting *Rodriguez*, 508 F.3d at 620).  Finally, the plaintiff must show that the officer's failure to reasonably respond caused his or her injury.  *See id.*  In sum, to establish deliberate indifference, a plaintiff must show (1) that an official was subjectively aware of a (2) substantial risk of serious harm and (3) disregarded that known risk by not responding to it in an objectively reasonable manner that (4) caused plaintiff's injury.  *Caldwell*, 748 F.3d at 1099; *Rodriguez*, 508 F.3d at 617.

Oliver argues that Officers Stanfield, Deese, and Weaver were subjectively aware of the substantial risk of serious harm Morgan posed to him. He also argues that all three defendants were deliberately indifferent because they allowed Oliver to remain in a cell with Morgan, leaving him vulnerable to a serious risk of harm.

As we explain, Oliver's arguments fail because the record lacks evidence that any of the defendants were aware of a "particularized threat" that would "enable them to conclude that" Oliver faced a "strong likelihood," rather than a "mere possibility," of injury. *Carter*, 352 F.3d at 1350; *Marbury*, 936 F.3d at 1236; *Brown*, 894 F.2d at 1537.  Because Oliver's communications with Officer Stanfield were separate from his communications with Officers Deese

and Weaver, we will analyze Oliver's claims against Officer Stanfield separately. *See Rodriguez*, 508 F.3d at 618–24.

## A. Officer Stanfield

Oliver argues that the district court erred in finding for Officer Stanfield because there is sufficient circumstantial evidence in the record from which a reasonable jury could conclude that Officer Stanfield was aware of the harm Oliver faced. Specifically, Oliver contends that the record shows that he told Officer Stanfield: (1) that he didn't "feel comfortable with [Morgan]. He's going [to] do something. He's already got his penis hanging out and making a - - a lot of sexual comments and statements about doing stuff."; (2) that Morgan's nickname was "Booty Bandit"; and (3) that he was transgender. Oliver also argues that the record shows that Officer Stanfield was assigned to the building that Oliver and Morgan lived in and therefore could hear Morgan's specific threats to Oliver. Oliver argues that this evidence is sufficient to show Officer Stanfield actually knew Oliver faced a substantial risk of being harmed by Morgan.

We disagree, as this Court's precedent establishes that no reasonable jury could reach such a conclusion based on this summary judgment record. The record evidence does not show that Oliver told Officer Stanfield that Morgan had explicitly threatened him, nor does it contain evidence that Oliver provided any additional information to Officer Stanfield about what he thought Morgan planned to do. *See Carter*, 352 F.3d at 1349 (quoting *Farmer*, 511 U.S. at 837) ("Even assuming the existence of a serious risk of harm

and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also 'draw that inference.'").

We have repeatedly held "that officials must possess enough details about a threat to enable them to conclude that it presents a 'strong likelihood' of injury, not a 'mere possibility.'" *Marbury*, 936 F.3d at 1236 (quoting *Brown*, 894 F.2d at 1537). Officer Stanfield simply did not possess enough details here. Oliver only told Officer Stanfield that Morgan would do "something" and that he didn't feel "comfortable" in the cell. He never told Officer Stanfield that he "feared [Morgan] or that [Morgan] clearly threatened [him]." *Carter*, 352 F.3d at 1349; *cf. id.* at 1349–50 (finding no deliberate indifference by a deputy warden despite Plaintiff complaining to him about Plaintiff's cellmate "acting crazy, wanting to fake a hanging, and making a statement that Plaintiff would help in the fake hanging 'one way or another,'" because the Plaintiff never communicated to the deputy warden that the cellmate clearly threatened him or scared him). And while it is understandable that Oliver would prefer not to share a cell with someone who masturbated in front of him and made sexual remarks, we can't say that this behavior alone put Officer Stanfield on notice that Morgan would attack Oliver.

This Court's decision in *Marbury v. Warden* is instructive. *See* 936 F.3d 1227 (11th Cir. 2019). In that case, an inmate "was attacked by a fellow prisoner after making multiple requests to be

transferred to a different dormitory or put in protective lock-up." *Id.* at 1231.  In one of his requests, the inmate asked a correction officer "to have the captain put him in lock-up until he could be transferred because he had heard from a friend that another inmate wanted to hurt him."  *Id.*  One day later, he wrote a letter to a prison warden that said: "I was told by a friend to watch my back, because he got word someone was out to do harm to me."  *Id.* at 1232.  He also said in the letter that he needed to be put in lock-up quickly because "he was in fear of being hurt or possibly killed."  *Id.*

In *Marbury*, we held that a reasonable jury could not conclude that the defendants were aware of a substantial risk based on "Marbury's statement that he had heard from a friend that an unarmed prisoner intended to hurt him, and that he was afraid of being hurt or killed, without any further details."  *Id.* at 1236.  In explaining our decision, we noted that usually further information—"beyond the plaintiff having informed the defendant officers of [a] threat"—is needed for a prison official to conclude "that a particular threat evidenced a substantial threat."  *Id.*

Unlike in *Marbury*, Oliver did not repeatedly convey that he was fearful of being *harmed or killed* due to threats he had received.  Instead, Oliver only vaguely speculated to Officer Stanfield that he thought Morgan was going to "do something."  And that is just simply not enough.

Officer Stanfield's knowledge of Morgan's nickname and Oliver's transgender identity does not change this analysis.  The record does not indicate the significance of Oliver's nickname.  And

the record contains no evidence that Morgan had ever engaged in a sexual assault before.  Without knowing more, Officer Stanfield cannot be expected to infer that a substantial risk of harm existed. *See Farmer*, 511 U.S. at 837 (A defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). And because Oliver presents as a man, Officer Stanfield would have no reason to think—much less know—that other inmates knew Oliver was transgender.  Officer Stanfield's *personal* knowledge of Oliver's gender identity is irrelevant.  What would matter is if Officer Stanfield knew that Morgan was aware of Oliver's gender identity. And the record provides no evidence of that contention.

Oliver's argument that Officer Stanfield knew about Morgan's specific threats to Oliver because he overheard them also falls flat.  There is no evidence in the record that Officer Stanfield was within ear-shot of Morgan's cell any of the times Morgan made threatening or sexual statements to Oliver.  Oliver points to the evidence that (1) Officer Stanfield was "permanently assigned to [Oliver's] building at the time" Morgan threatened Oliver and (2) that he was sometimes around to run showers or move inmates between cells.  But nothing in the record suggests that Officer Stanfield's "permanent assignment" to Oliver's building would entail monitoring Oliver's cell block at all hours.  And there is no evidence that Morgan made threatening remarks to Oliver when Officer Stanfield was running showers or moving inmates between cells.  Accordingly, a reasonable jury would have no basis for concluding that Officer Stanfield overheard—and therefore knew

about—Morgan's threats due to being within hearing-distance of Morgan at the time he made threats to Oliver.

In sum, the record lacks sufficient evidence to show that Officer Stanfield had actual knowledge that Oliver faced a serious risk of harm. We thus conclude that Officer Stanfield was not deliberately indifferent in violation of the Eighth Amendment.

### B. Officers Deese and Weaver

Oliver's claims against Officers Deese and Weaver fare no better. Oliver argues that: (1) he orally told Officers Deese and Weaver that "there's something not right [with Morgan]. He's on - - on narcotics, drugs, and I need[] to be moved out."; (2) Officers Deese and Weaver had a substantial amount of daily contact with the inmates, making them aware of Morgan's threats; and (3) Officers Deese and Weaver, like Officer Stanfield, knew about Morgan's nickname. Similar to his arguments about Officer Stanfield, Oliver asserts that this evidence is enough to show Officers Deese and Weaver's subjective knowledge of a substantial risk of serious harm. Again, we disagree.

Oliver's statements to Officers Deese and Weaver, like those made to Officer Stanfield, are vague and do not convey any "specific facts" that would enable Officers Deese or Weaver to draw an inference that Oliver faced a substantial risk of serious harm. *Carter*, 352 F.3d at 1349. They also do not convey to Officers Deese or Weaver that Morgan ever made a particular threat to him. *Cf. id.* at 1350 (affirming summary judgment on a deliberate indifference claim because the prison official was only aware of the

attacker-inmate's "propensity for being a problematic inmate" and not any "particularized threat or fear").

Oliver's statements to Officers Deese and Weaver are like those made by the plaintiff in *Carter*. *See id.* at 1348. In that case, the plaintiff complained to prison officials that his cellmate was "acting crazy, wanting to fake a hanging," and told the plaintiff that he "would help in the fake hanging 'one way or another.'" *Id.* at 1349. We held in *Carter* that those statements were not sufficient for the prison officials "to make the inferential leap that [the plaintiff faced] a substantial risk of serious harm." *Id.* at 1350. We further explained that the plaintiff's statements only made the prison officials aware of the plaintiff's cellmate's generally problematic nature and that such "a generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement." *Id.*

Oliver's statements similarly lack the requisite particularity. Like the plaintiff's statements in *Carter*, Oliver's comments to Officers Deese and Weaver only made them aware of generalized risks Morgan posed, not specific or particularized ones. *See id.* Because Officers Deese and Weaver only possessed awareness of a general risk, we cannot conclude that they had subjective knowledge of a substantial risk of serious harm.

Lastly, Oliver's arguments about the Officers' daily contact with inmates and their knowledge of Morgan's nickname are identical to those made for the claim against Officer Stanfield, and they fail for the same reasons.

## IV.    CONCLUSION

What happened to Oliver was awful.  But on this record, he simply has not carried his burden to show that Officers Stanfield, Deese, and Weaver had actual knowledge about any specific threats made by Morgan to Oliver.  So we must conclude that Officers Stanfield, Deese, and Weaver were not deliberately indifferent to a substantial risk Oliver faced.  Because no constitutional violation has been established against any of the defendants, we affirm the district court's order granting summary judgment in favor of Officers Stanfield, Deese, and Weaver.

**AFFIRMED.**